**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Dodson,<br><br>             Plaintiff,<br><br>v.<br><br>Nissan North America, Inc., and Nissan Motor Acceptance Company, LLC,<br><br>             Defendants. | No. CV-23-00939-DLR<br><br>**ORDER** |

Plaintiff William Dodson alleges that his former employer, Defendants Nissan North America, Inc. ("NNA") and Nissan Motor Acceptance Company ("NMAC") (collectively "Nissan"), violated the Age Discrimination in Employment Act ("ADEA") by eliminating his position and refusing to hire him for other positions due to his age, and in retaliation for engaging in protected activity. (Doc. 1 at ¶¶ 64-66, 77-79.) At issue is Nissan's motion for summary judgment (Doc. 58), which is fully briefed (Doc. 80; Doc. 85). The Court heard oral argument on March 28, 2025. (Doc. 86.) As explained below, Nissan's motion is granted.

### I.     Background

NMAC is a subsidiary of NNA; it offers loan financing to Nissan and Infiniti dealers. (Doc. 58-2 at 2.) NMAC hires Financial Services Managers ("FSM") who facilitate vehicle financing between dealers and NMAC. (*Id.* at 3.) To effectively manage these

relationships, NMAC divides its operations into geographic districts and assigns FSMs to each one. (*Id.*)

Dodson had worked for Nissan since 1994: first at NNA as a specialist in marketing and sales between 1994 and 2000, and subsequently for NMAC as an FSM between 2000 and 2020. (Doc. 80-1 at 12, 14, 202.) He was based in the Phoenix area and was most recently responsible for the New Mexico and Arizona territories in NMAC's Mountain Region. (Doc. 80-1 at 15; Doc. 58-2 at 3.)

In early 2020 NMAC decided to roll out a reorganization, which eliminated two regions and their corresponding positions. (Doc. 58-7 at 6-7; Doc. 58-2 at 3-4.) Several NMAC managers formed a working group to manage the reorganization. (Doc. 58-2 at 3-4.) They restructured the districts and created "Signature Direct," a remote Dallas call center to serve smaller dealers. (*Id.* at 4.) In total, the working group eliminated fifteen positions, including Dodson's. (*Id.* at 6-10.)

The working group then decided whether any impacted employees could fill open positions. (*Id.* at 5.) Mark Lubbers, a member of the working group, decided who would fill the six new Signature Direct FSM roles in Dallas. (*Id.* at 5-6.) Lubbers did not pick Dodson for one of those roles. (*Id.* at 10.) Lubbers appointed three people to fill the new Signature Direct FSMs and posted the other three openings for anyone to apply. (*Id.* at 11.)

On June 4, 2020, Dodson received a phone call from Jamie Beck, Eric Ledieu, and a Human Resources ("HR") representative in which they told Dodson that his position had been eliminated and that his last day in the role would be August 3, 2020. (Doc. 58-3 at 32-33; Doc. 58-6 at 2.) Dodson received an email later that day which included the details of his layoff. (*Id.*; Doc. 58-4 at 12.) The email states that Dodson's "position will be eliminated . . . on August 3, 2020," that he "may apply for open positions at NNA," and that if he received an offer for a comparable position, he would not be eligible for severance benefits. (Doc. 58-4 at 12.) Dodson acknowledged receipt of the notice by signing it on June 19, 2020. (*Id.* at 14.)

Dodson chose to apply to other Nissan jobs. (Doc. 58-3 at 33.) He submitted applications for four positions: (1) Upstream Remarketing Sales Manager, (2) Senior Dealer Operations Manager, (3) Remarketing Strategy Manager, and (4) FSM Signature Direct. (*Id.* at 21, 36, 41-42, 45.)

Around June 17, Dodson informed an HR representative that he thought he was the victim of age discrimination. (Doc. 80-1 at 119-20, 134).

Subsequently, Dodson received four job rejections: from the Upstream Remarketing Strategy Manager position on July 6; from the Senior Dealer Operations Manager role on July 21; from the Remarketing Strategy Manager role on July 27; and from the FSM Signature Direct position on July 28.[1] (Doc. 58-11 at 44; Doc. 58 at 13; Doc. 58-18 at 5.)

Having failed to secure another position, Dodson's last day at Nissan was August 3, 2020. (Doc. 58-4 at 12.) At that time, Dodson was 55 years old, and his performance met expectations. (Doc. 58-15 at 2; Doc. 58-2 at 10.)

On August 4, 2020, Nissan processed Dodson's termination. (Doc. 58-3 at 55-56; Doc. 58-6 at 7.) He received a list of job titles and ages of those terminated with him. (Doc. 73-3 at 18.) Of the fifteen positions that NMAC eliminated, only eight people were terminated. (*Id.*) Seven of those eight were over the age of 40. (*Id.*) The remaining person was an employee in his thirties who had declined his job offer. (*Id.*; Doc. 58-2 at 11; Doc. 58-15 at 2.)

Dodson initially filed a charge with the Equal Employment Opportunity Commission ("EEOC") on May 28, 2021, but the EEOC rejected it. (Doc. 58-3 at 6-11, 30-31; Doc. 58-4 at 6-11.) Dodson then refiled on June 1, 2021. (*Id.*)

---

[1] Dodson also contends that he was not hired as a contractor for Nissan after his termination. However, Nissan had no control over the initial hiring of contract candidates. Instead, Nissan inputs qualifications it is looking for, a third-party entity called Kelly Services decides who to hire, and Nissan can later ask Kelly Services not to utilize that contractor again if Nissan is dissatisfied with the contractor's performance. (Doc. 80-1 at 113.)

## II. Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court may also enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that's party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying portions of the record that show an absence of a genuine dispute of material facts. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted).

## III. Analysis

Nissan principally asserts that Dodson's claims are time-barred. In the alternative, they allege that there are no genuine issues of material fact that would sustain Dodson's disparate treatment, retaliation, and disparate impact claims. The Court agrees that Dodson's claims are time-barred and therefore does not reach Nissan's alternative arguments.

For Dodson's claims to be timely, he must have filed his Charge of Discrimination with the EEOC within 300 days after the alleged unlawful employment practice occurred. 29 U.S.C. § 626(d)(1)(B); *see Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). Termination, refusal to hire, and retaliation are all considered discrete

discriminatory acts, and each one "starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002).

Dodson claims he was discriminated against on account of his age under disparate treatment and disparate impact theories, and that he was retaliated against for engaging in protected activity. These claims can be broken down into several discrete acts: the elimination of his position and each instance of Nissan's failure to hire him for other positions within the company.[2]

Dodson received a phone call from his superiors on June 4, 2020, in which they told him his position had been eliminated. He also received an email later that day with the details of his position's elimination: his last day in the role would be August 3, 2020, but he could apply to other Nissan jobs. Together, the phone call and email adequately communicated to Dodson that Nissan was eliminating his position as a part of its reorganization. Even though Dodson's last day at NMAC was August 3, 2020, he received notice of his position's elimination on June 4, 2020, and any claim relating to his termination began to accrue on that date. *Delaware State Coll. v. Ricks*, 449 U.S. 250, 257-58 (1980) (finding that the plaintiff's termination of employment was "a delayed, but inevitable consequence" of the university's prior decision not to grant him tenure). Accordingly, his EEOC filing deadline for this discrete act was March 31, 2021. Further, Nissan issued Dodson four job rejections: on July 6, 2020, July 21, 2020, July 27, 2020, and July 28, 2020. The deadlines to file for those discrete acts were May 2, 2021, May 17, 2021, May 23, 2021, and May 24, 2021, respectively. Dodson, however, did not file his charge with the EEOC until June 1, 2021.

Dodson does not argue that any of these deadlines should be tolled. Instead, his timeliness argument is two-fold. First, he insists that his filing deadline for all claims—including, somehow, each instance in which Nissan declined to hire him for a new

---

[2] The parties' briefs do not suggest that the timeliness analysis for disparate impact liability would differ from that of disparate treatment. The adverse actions of which Dodson complains (namely, his job being eliminated during the reorganization and him later being passed over for other positions within the company) are merely discrete *applications* of the facially neutral policy that Dodson contends caused a disparate impact.

- 5 -

position—was August 3, 2020, the day he was officially discharged from his employment. (Doc. 80 at 6.) But this argument runs counter to the Supreme Court's reasoning in *Ricks* because Dodson indisputably was put on notice on June 4, 2020 that his position was being eliminated, and that he would be terminated on August 3, 2020 unless he secured a different position within the company. A plaintiff's claim begins to accrue when the employment action is communicated to him, not when the consequences become most painful. *See Ricks*, 449 U.S. at 258. Here, that date was June 4, 2020, when Nissan communicated to Dodson its decision to eliminate his position.

Second, Dodson argues that because he did not receive a full list of the ages and job titles of those who were terminated until August 4, 2020, it was not clear to him until that date that he was a victim of age discrimination.[3] But the limitations clock starts running "when the plaintiff knows or has reason to know of the actual injury," not when the plaintiff realizes "the legal injury, i.e., that there was an allegedly discriminatory motive underlying" the adverse action. *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008). Here, Dodson knew that he had been actually injured on June 4, 2020, when Nissan informed him that his position was being eliminated as part of the reorganization, and again on July 6, 2020, July 21, 2020, July 27, 2020, and July 28, 2020, when Nissan rejected his applications for each of the four positions for which he applied. He did not file his EEOC charge within 300 days of any of those dates. Therefore,

**IT IS ORDERED** that Nissan's motion for summary judgment (Doc. 58) is **GRANTED**. The Clerk shall enter judgment accordingly and terminate this case.

Dated this 16th day of April, 2025.

Douglas L. Rayes
Senior United States District Judge

---

[3] This argument is undercut by the fact that Dodson complained to HR about perceived age discrimination on June 17, 2020.